**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATTHEW LOPEZ, *Individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>TERRA'S KITCHEN, LLC,<br><br>Defendant. | Case No.: 18cv842-MMA (JLB)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>[Doc. No. 8] |

Plaintiff Matthew Lopez ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Terra's Kitchen, LLC ("Defendant") alleging causes of action for violations of California's Automatic Renewal Law ("ARL"), California Business and Professions Code § 17600, e*t seq.*, and California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq*. *See* Doc. No. 1 ("Compl."). Defendant moves to compel arbitration and stay this case pursuant to the Federal Arbitration Act ("FAA"). Doc. No. 8-1 ("Mtn."). Plaintiff filed an opposition [Doc. No. 10 ("Oppo.")], to which Defendant replied [Doc. No. 11 ("Reply")]. The Court, in its discretion, decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1.d.1. For the reasons set forth below, the Court **DENIES** Defendant's motion to compel arbitration and to stay.

## BACKGROUND

Defendant operates a website which markets and offers various subscriptions for ready-made meals. Compl., ¶¶ 8, 18. According to Plaintiff, these subscription programs "constitute[] . . . automatic renewal and/or continuous service plan[s] or arrangement[s] . . . ." Compl., ¶ 18. Plaintiff purchased a subscription plan from Defendant and seeks to represent a class of "all persons in California who, within the applicable statute of limitations period up to and including the date of judgment in this action, purchased subscriptions for products (such as ready-made meals and related products) from [Defendant]." Compl., ¶¶ 1, 22.

Plaintiff alleges that: (1) Defendant's automatic renewal or continuous service offers failed to present the offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer prior to purchasing the subscription; (2) Defendant charged Plaintiff's and class members' credit or debit cards, or third-party accounts, without first obtaining the subscriber's consent to the agreement containing the terms of the offer; and (3) Defendant failed to provide an acknowledgment including the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner capable of being retained by the consumer. Compl., ¶ 2.

Specifically, Plaintiff alleges that "[o]n the pages where the subscriber makes the purchase, there was no description of the [automatic renewal offer terms or continuous service offer terms]." Compl., ¶ 19. As such, Plaintiff alleges that Defendant "failed to obtain Plaintiff's and Class Members' affirmative consent to the automatic renewal offer terms or continuous service offer terms . . . ." Compl., ¶ 20. Further, after subscribing to one of Defendant's subscription plans, Defendant sends a follow-up email to the subscriber. Compl., ¶ 22. Plaintiff alleges that these emails fail "to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and Class Members . . . ." *Id.*

As a result, Plaintiff alleges "all goods, wares, merchandise, or products, sent to Plaintiff and Class Members under the automatic renewal or continuous service agreements are deemed to be an unconditional gift . . . ." Compl., ¶ 2. Based on these allegations, Plaintiff raises the following causes of action: (1) failure to present automatic renewal or continuous service offer terms clearly and conspicuously and in visual proximity to the request for consent offer in violation of the ARL; (2) failure to obtain the consumer's affirmative consent before the subscription is fulfilled in violation of the ARL; (3) failure to provide acknowledgment with automatic renewal terms and information regarding the cancellation policy in violation of the ARL; and (4) violations of California's UCL for unlawful and/or unfair business practices. Compl., ¶¶ 34-58.

## **LEGAL STANDARD**

The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. *Id.*

The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements. *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011). Federal courts are required to rigorously enforce an agreement to arbitrate. *See id.* Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–76 (1989).

In determining whether to compel a party to arbitration, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal quotation marks and citation omitted). If the

Court finds that the answers to those questions are "yes," the Court must compel arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). If there is a genuine dispute of material fact as to any of these queries, a district court should apply a "standard similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]." *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

Agreements to arbitrate are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C. § 2. Courts must apply ordinary state law principles in determining whether to invalidate an agreement to arbitrate. *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002). As such, arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. *Concepcion*, 563 U.S. at 339-41.

## DISCUSSION

According to Defendant, Plaintiff's claims against it are subject to arbitration pursuant to the following arbitration provisions contained within the Terms & Conditions on Defendant's website:

> **DISPUTE RESOLUTION**
> 25. WE AGREE TO ARBITRATE IN OUR INDIVIDUAL CAPACITY
> 25.1  If we have a dispute that we cannot resolve, both you and [Defendant] agree to resolve all claims . . . exclusively through binding arbitration, in accordance with the rules of the American Arbitration Association, by a neutral arbitrator in a location within one hundred (100) miles of your residence.

Doc. No. 8-2, Declaration of Brendan Connors in Support of Motion of Terra's Kitchen to Compel Arbitration ("Connors Decl."), Exhibit 2, ¶ 25. Additionally, the first page of Defendant's Terms & Conditions also provides:

> **REALLY IMPORTANT LEGAL STUFF**
> . . .
> 3. IF WE HAVE A BAD BREAK UP, YOU HAVE TO ARBITRATE SOLO. These Terms and Conditions dictate how we'll settle any disputes.

> Specifically, and very importantly, you are agreeing to exclusively use binding arbitration on an individual basis to resolve disputes. That means no jury trials, and no class actions.

*Id.*, Exhibit 2, ¶ 3. In opposition, Plaintiff contends that it never assented to the Terms & Conditions on the website. Oppo. at 8-16.

A.  **_Type of Agreement_**

"'Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.'" *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). "Questions of contract formation are questions of state law." *Cordas*, 228 F. Supp. 3d at 988. In California, "mutual assent [by word or conduct] is the key to contract formation." *Id.*; *see Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law).

The arbitration agreement at issue here is contained within the Terms & Conditions that govern visitors to Defendant's website. As explained by the Ninth Circuit, "[c]ontracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen v. Barnes & Noble Inc.*, 763

F.3d 1171, 1175-76 (9th Cir. 2014).[1]  While clickwrap agreements require the user to expressly manifest assent to the terms and conditions, browsewrap agreements do not; rather a party assents to a browsewrap agreement simply by using the website.  *Id.* at 1176 (quoting *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009).  "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists."  *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013).  Additionally, courts have held that a hybrid between a clickwrap and browsewrap agreement is binding where the consumer is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under an "I Accept" button and then clicks that button.  *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011); *see Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 834-35 (S.D.N.Y. 2012) (finding that the user was put on inquiry notice when the user clicked on the "Sign Up" button and right below the button was a sentence that "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service").

Plaintiff argues the arbitration provision within the Terms & Conditions is contained within a browsewrap agreement and Defendant contends the agreement is a hybrid agreement.  Oppo. at 7-8; Reply at 4.  If the agreement is not a hybrid, Defendant argues the agreement is a browsewrap agreement to which Plaintiff manifested assent.  Reply at 6-9.

The Court finds that the agreement is not a hybrid between a clickwrap and a browsewrap agreement.  Defendant asserts that on the first page of the Terms & Conditions the consumer is notified that "[i]f you keep going and use the Services—even just browsing the Site—you agree to comply with and be bound by all these Terms and

---

[1] In *Nguyen*, the Ninth Circuit applied New York law, but acknowledged that "California and New York dictate the same outcome." *Nguyen*, 763 F.3d at 1175.

Conditions . . . ." Mtn. at 10; Connors Decl., Exhibit 2, ¶ 5. Essentially, Defendant moves the Court to hold that language contained within the Terms & Conditions provides the consumer an opportunity to review the terms of service in the form of a hyperlink merely because the hyperlink is below a button the consumer must click on. *See* Reply at 4; Mtn. at 10. The Court is unpersuaded that this creates a hybrid agreement. Importantly, this scenario distinguishes this case from the cases Defendant cites to in support of its argument. For example, in *Meyer v. Uber Techs., Inc.*, "[b]elow the input fields and buttons on the Payment Screen is black text advising users that '[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 71 (2d Cir. 2017). Similarly, in *Fteja*, a putative Facebook user must click a "Sign Up" button which appears directly above text advising the user that "[b]y clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." *Fteja*, 841 F. Supp. 2d at 835. Here, Defendant points to no language on its webpages indicating that by clicking a button on its webpage, the consumer is indicating that he or she has read and agrees to the Terms & Conditions; rather, Defendant argues that the language contained within the Terms & Conditions is sufficient. *See* Mtn.; *see also* Reply.

The Court finds that the agreement at issue in this case is a browsewrap agreement because the consumer assents to the Terms & Conditions simply by using the website or purchasing a subscription, without visiting the Terms & Conditions page or even acknowledging that use of the website constitutes assent to the Terms & Conditions. *See Nguyen*, 763 F.3d at 1176 (quoting *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009); *Be In, Inc.*, 2013 WL 5568706, at *6 ("The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists."); *see also* Connors Decl, Exhibit 2, ¶ 5 ("If you keep going and use the Services—even just browsing the Site—you agree to comply with and be bound by all of these Terms and Conditions and our Privacy Policy.").

**B.** *Notice*

Because the Court finds that the arbitration provision within the Terms & Conditions is contained within a browsewrap agreement, the Court must next determine whether Plaintiff has manifested assent to the agreement. Courts have consistently found that users manifest assent to browsewrap agreements where the user: (1) had actual notice of the agreement; and/or (2) where the website puts a reasonably prudent user on inquiry notice of the terms of the agreement. *Nguyen*, 763 at 1176-77.

    1. *Actual Notice*

As an initial matter, Plaintiff declares that he was in fact unaware of the arbitration agreement provision in Defendant's Terms and Conditions. Doc. No. 10-1, Declaration of Matthew Lopez in Support of Plaintiff's Opposition to Defendant's Petition to Compel Arbitration and Request for Stay ("Lopez Decl."), ¶¶ 3-7. Plaintiff represents that he did not see, let alone read, the Terms & Conditions containing the arbitration provision at the time he made a purchase on Defendant's website. *See id.* In fact, Plaintiff avers that he only learned of the Terms & Conditions and arbitration provision when Defendant filed the instant motion. *Id.* Defendant has not adduced any evidence challenging Plaintiff's declaration.[2] *See* Mtn.; *see also* Reply. Accordingly, the Court finds that Plaintiff did not have actual notice of the arbitration terms.

    2. *Inquiry Notice*

With respect to inquiry notice, courts have refused to enforce browsewrap agreements "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it . . . ." *Nguyen*, 763 F.3d at 1177 (citing *Specht*, 306 F.3d at 30-31; *In re Zappos.com, Inc.*

---

[2] Defendant argues that Plaintiff had actual knowledge because he is "a sophisticated internet user" and a "professional plaintiff." Reply at 8. Defendant provides no legal authority in support of its argument. *See id.* Moreover, the Ninth Circuit has found that a plaintiff's "experience with the browsewrap agreements found on other websites . . . has no bearing on whether he had . . . notice of [defendant's browsewrap agreement]." *Nguyen*, 763 F.3d at 1179.

*Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 792-93 (N.D. Ill. 2011); *Hines*, 668 F. Supp. 2d at 367). Conversely, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* (citing *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-04825, 2005 WL 756610, at *2, *4-5 (N.D. Cal. Apr. 1, 2005); *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000)). The Ninth Circuit explained that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to [inquiry] notice." *Id.* at 1178-79.

Here, Defendant argues that Plaintiff "agreed to the arbitration provision by accepting and using [Defendant's] meal delivery service" because "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Mtn. at 9 (citation omitted). According to Defendant, Plaintiff knew that Defendant's service was subject to the Terms & Conditions because they were made available on Defendant's website. *Id.* at 10. Specifically, Defendant contends that the Terms & Conditions hyperlink appears in two places which put Plaintiff on inquiry notice. *See id.* at 9; s*ee also* Reply at 7-8. First, the hyperlink "appear[s] on the company's homepage, and in the same place on every other page." Mtn. at 9. Second, the Terms & Conditions hyperlink is "feature[d] prominently on the check-out page, appearing in different color and centered on the page below the button to complete the purchase." Mtn. at 9. Plaintiff concedes that the hyperlink is available on every page of Defendant's website and below the "place order" button on Defendant's order summary page. Oppo. at 7-8. However, Plaintiff argues that the hyperlink on every webpage is inconspicuous and that the hyperlink below the "place order" button does not provide

9

notice that completing the order manifests assent to Defendant's Terms & Conditions. *Id.* at 7-8.

Materials provided to the Court indicate that the hyperlink to Defendant's Terms & Conditions appears in the bottom left-hand corner of the website footer of Defendant's webpages, below a grouping of 21 other hyperlinks, arranged in five columns, that cover topics like "Careers," "Buy a Gift Card," "Mediterranean Diet," and "Newsroom." Doc. No. 10-2, Declaration of Scott J. Ferrell, Esq. in Support of Plaintiff's Opposition to Defendant's Motion to Compel Arbitration ("Ferrell Decl."), Exhibit B at 4. The hyperlink is the same font-size and color as the other hyperlinks, with no noticeable attributes. *Id.*; *see Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63-64 (1st Cir. 2018) (noting that some characteristics make a term conspicuous, like larger size, typeface). The hyperlink also appears on the "order summary" page below the "place order" button and below text regarding the purchase. Ferrell Decl., Exhibit A at 9. The text in between the hyperlink and the "place order" button states in gray typeface:

> *\* Your card will be charged on 2017-05-05 for this order and you will no longer be able to make changes to your weekly delivery at that time.*
> *\*\* Sales tax will be applied to orders in AR and IL when your card is charged.*

*Id.* The hyperlink itself is in green typeface. *Id.*

Based on the materials provided to it, the Court finds this case to be analogous to *Nguyen*. *Nguyen*, 763 F.3d at 1178. As in this case, the hyperlink in *Nguyen* was placed "in the bottom left-hand corner of every page on the [defendant's] website" and on some webpages was "directly below the relevant button a user must click on to proceed in the checkout process." *Id.* at 1177-78. Nonetheless, the Ninth Circuit held that the proximity

10

18cv842-MMA (JLB)

or conspicuousness of the hyperlink, which was "underlined and set in green typeface" in *Nguyen* was insufficient to give rise to constructive notice.³ *Id.* at 1174, 1178.

Here, the Terms & Conditions hyperlink is more or less buried at the bottom of Defendant's webpage. Under *Nguyen*, without more, this is insufficient to give rise to inquiry notice. *Nguyen*, 763 F.3d at 1178-79. The Court finds that the "more" in this case—the proximity of the hyperlink in green typeface to the "place order" button, without affirmative acknowledgment of the agreement before proceeding with the purchase—is not enough to give rise to inquiry notice. *See id.* As in *Nguyen*, the proximity or conspicuousness of the Terms & Conditions hyperlink is insufficient to give rise to inquiry notice. *See Nguyen*, 763 F.3d at 1178. As such, Plaintiff did not assent to the Terms & Conditions and, therefore, he is not bound by Defendant's arbitration agreement.⁴ *See id.* at 1178-79.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion to compel arbitration and to stay the case.

Dated: September 19, 2018

Hon. Michael M. Anello
United States District Judge

---

[3] Curiously, despite *Nguyen's* holding, Defendant argues that "[t]he proximity to the very important Place Order button along with the green text that stands out on the website does put a reasonably prudent user on notice of it." Reply at 7.

[4] In light of the Court's finding that Plaintiff did not assent to the arbitration provision within Defendant's Terms & Conditions, the Court declines to address Defendant's arguments regarding the scope and enforceability of the arbitration agreement. Mtn. at 10-14.